And we'll proceed to hear argument in the next case on calendar for argument, which is 25-1025 Anna Christine Lewis and Bradley Lewis versus Chris Nanos et al. And we will hear first from Mr. Autolet. Did I play? I got that correctly. You did. All right. May it please the court. Counsel, my name is Daryl Autolet. I represent the defendants in this case. My co-counsel is Andrew Peterson. Both are from Tucson. We're from Tucson. Your Honors, this case is the quintessential case that warrants the application of qualified immunity, both prongs of qualified immunity. We know from the case law that qualified immunity can be granted on both prongs. Prong one here, of course, is the Fourth Amendment, Graham versus Connor, objective reasonableness, objectively reasonable conduct. Prong two, clearly established law. Both of those prongs warrant application. These cases, qualified immunity cases, are in the very first instance questions of law for the court, not jury questions. Questions of law for the court. So it's a question of law, whether the deputies were in reasonable fear of their life in the circumstance. That's a question of law. It becomes a question of law. Yes. Based on material undisputed facts. When that is the appropriate conclusion, one of the deputies made a statement after the incident that he was not in fear of his life. Correct. That was Sergeant Mosley, who said both he was in fear of his life at certain times and he wasn't in the investigative aftermath of the incident. Sergeant Mosley said he was not in fear of his life. Correct. That's correct. From his position, he was not standing in Kadio's shoes with this man who had a history of gun violence coming at him with a black object. Is the record uncontested that he was coming? Yes. No, I don't think it is. There's your Kadio testifies that he's coming between the two trucks. Yes. And what we see is that the distance between the two trucks makes that quite unlikely. We have an expert who testifies for the plaintiff that he was shot before he came between the trucks. And then we have this whole issue of whether or not the officers should have recently perceived that the decedent who was unarmed was unarmed. And there's evidence that he was illuminated with with high intensity lights. The district judge mentions all this stuff and says, look, that creates a fact question. These are issues of material fact that I taking the evidence in the light most favorable to the to the plaintiff side. I think there are fact issues. So I'm having difficulty thinking about why in this case it's a question of law. There is no evidence that from the time he left the driver's seat of his truck, Mr. Lewis stopped until he hit the ground after being shot. He hit the ground, hit the ground before the space between the trucks, correct? No. Isn't that exactly what he got? He got it. Wait, let me just finish. Sure. Isn't it? You're contending that he was on the ground in the space between the trucks in that four inch space. No, sir. So he was on the ground before reaching the space between the trucks. Correct. Let's get let's get clear on this direction. Let's get clear on the direction. He comes out of his truck. Right. Towards Godot. He's going down the side of his bed, the driver's side of the right before he reaches Godot's truck or vehicle. OK, he gets through that gap. You're saying that. But it seems to me there's substantial evidence to the contrary. There's not. And in fact, the evidence, the photographic evidence shows the bloodstain where he landed two feet past the rear bumper of that truck. If those photos are in the record. Right. But not in the gap between the trucks. Correct. The blood, which the blood two and a half to three feet from the rear bumper of the truck, which puts him about six and a half feet in front of Officer Deputy Cadillac. I'm still asking the same question. There's a there's a there's a gap between the between Lewis's truck and Godot's vehicle. Correct. That's the gap you're talking about. I thought we were talking about the gap between. No, no. I'm sorry. I was I was not clear. I'm sorry. There's a gap between the two vehicles. Correct. And it's rather narrow. Yes. Well, he is not in that gap. That's where he lands. He lands and he lands in that Ford again. Focus on the gap between Godot's vehicle and and Lewis's vehicle. Are you saying that he was in that he fell into that four and a half inch gap? You called it a four and a half inch gap. Whatever the gap was. Well, whatever the size of it was, you're saying that he was he fell into the gap between the two vehicles or what you're saying is that he fell in the distance between where his door was and Godot's and where where the gap between the Godot vehicle and the Lewis vehicle was. He got out of his truck and in Mosley's words, bolted lightning fast to the rear of his truck. There was his truck. OK, I understand that. I understand. Let's assume that's true. He couldn't have. Godot says he's coming right at me. Yes. And he can't come through that gap. Can he? Yes. No. Yes, he cannot. There are two gaps, the gap. I know. I know the one you want to keep focusing on the gap between his door and Godot's vehicle. And I'm asking you to focus on the gap between Godot's vehicle and and and the park truck, the front of Godot's patrol vehicle. He could not have gotten all the way to where Godot was, correct? He didn't make it that far. No, because he could not have gotten there because the there was because the trucks were so adjacent to each other that he couldn't. I've looked at the photos, too. He couldn't have walked or anything but dive over that over that gap. Correct? No. Let me let's let's try something where I'm where we probably won't fight about the facts, just the interpretation of them. You agree that he wasn't armed. In hindsight, he was not. Well, he wasn't armed. He wasn't armed, whether it's in hindsight or foresight or whatever. He don't fight me on this. He wasn't armed. Correct. Graham versus Connor tells don't tell me what to look at. This isn't about a predicate fact. OK. He wasn't armed. Correct. Correct. If the officer should have reasonably perceived that he wasn't armed, then we have a Fourth Amendment violation, do we not? If the officer would have perceived he was not armed before he makes a decision to shoot. Yes. Well, I mean, we get back to Wade versus. No, no, no. Just just city of law. Officer looks at this gentleman coming out of the car and says he's not armed, but I'm going to fire at him anyway because he's walking towards me. That would be a Fourth Amendment violation, would it not? In Wade versus city of or county of Lyon, the court held the North Ninth Circuit held that a person running at the officers in a narrow hallway, unarmed, empty hands, shot five times was not a Fourth Amendment violation. Well, let's focus on that issue. Would you agree that it is an issue of material fact whether Lewis was charging at Kadeel? Yes or no? No. It's not a material fact? No. Why not? He can shoot his gun from any position. He can shoot if the claim is he's falling, diving, et cetera. This is not a knife case. Didn't this is a gun case. So it turns out not to be a gun case because there's no gun in which if you're arguing that he reasonably perceived that he had a gun, I understand that. But now you're saying I don't care whether he had a gun or not. He was entitled to shoot him. No, I'm not saying that. I'm saying Wade versus Lyon says that. In a hallway where there's no obstruction to the person getting all the way there. No obstruction here to getting to Kadeel. So that's what I'm still having difficulty with this. Are you saying that he had a free path all the way to where Kadeel was standing? Yes. How do you deal with the pictures that show that there's a narrow gap between that he'd have to a four inch or six inch gap that he'd have to make his way through? So you're using the four point three inch. What would it make it six? Make it seven. I mean, it was a nine or ten. And this was a this was one hundred and forty hundred and fifty pounds skinny young man. He made it through that gap between the grandfather truck and his truck. And he was shot and landed two and a half feet further than that gap towards Kadeel. Six and a half feet from where Kadeel was standing. On the issue of whether Lewis was charging at Kadeel, isn't it correct that Sergeant Mosley thought Lewis was trying to get into his grandparents house? No, he didn't say that. He never said that. We may save council some time. Am I right? OK. Seven one seven at four. That is in the Mosley statement. Yes, I stand corrected. Yes, sir. Thank you. What about the expert testimony about the trajectory of the bullet and where Lewis landed? Right. Well, we know he's traveling down the driver's side of the bed of his pickup towards Kadeel. You with me? And he may he has to turn to get through that. And it's a nine or ten inch gap measured by their own biomechanical engineer, Dr. Joe Pellis, when he tries to do this recreation. It's not a four inch gap, nine or ten inch gap. If you look at the aerial and if you look at the ground view facing the rear of the truck, you'll see that the outside side mirror of the F-150 grandfather's F-150 sticks out kind of into that gap right at the corner of the left hand rear corner of the truck bed. So he's got to get around that mirror. So his position. And he is over here has to be something like this for the trajectory to enter his shoulder and go into his chest cavity, I think, into his right lung. So he's either crouched, they call it, he's falling, he's diving, etc. He is his right shoulder is lowered. He could be getting around that side view mirror. If Sergeant Mosley was correct, that what Lewis was attempting to do was to get into his grandfather's house. Wouldn't that mean he was not charging a good deal? I don't know how you draw that conclusion. He's well, he's he's fleeing. He's in flight. If he's trying to get in the house, he's trying to get in the house in a darn hurry. Here's my point. If Sergeant Mosley is correct, that what Lewis was doing was heading toward the grandparent's house, wouldn't that contradict the notion that he was charging it? Yes or no. No. Tell me why. Because he has to come to a deal far enough to get past the edge of his truck to turn left to go into the garage, into the house. Look at the aerial. Look at the ground level photo. I had intended to reserve five minutes, but I'm past that now. That's all right. I I'll raise the clock up to five to give you rebuttal because we've asked you a lot of questions. Thank you, sir. OK, but we'll hear now from Mr. Coronado. Good morning. May it please the court. Strickland family. Parents of Bradley Alexander Lewis. The request, of course, is that the court this court affirm the ruling by the district court. Ruling that there is, at least at this point, no qualified immunity and based on the fact that court obviously enumerated several, several issues that it saw were questions of fact. What do you see as the key disputed issues of material fact that are relevant to the use of force by Kadyu? Your Honor, the key is the lack of immediate threat to Kadyu. And the reason is, can you can you I mean, that is kind of a mixed question of law and fact phrasing of it. Can you tell me in terms of a purely factual issue, what are the factual issues that are in dispute that need to to be tried with respect to the issue of Kadyu's use of force? Yes. Is there a factual issue about their direction? He was moving. Tell me in terms of fact, not in terms of mixed question of law and fact. Thank you. I will do my best. Bradley Alexander Lewis is known as Alex, so I will refer to him as Alex. Alex gets out of his vehicle. Sergeant Mosley is really close to him. So he starts he he starts going towards I'll call it the first the first gap. Right. The gap is the wedge between the Ford truck and the Toyota truck. That that's the first gap he starts going through. I'm looking at the visual. Tell me. Tell me which car. You know, I see his car at the front, the park car and then Kadyu's car. Tell me in relation to that. I would say that that's the second gap. Your honor, because there's there's there's a Ford truck which belongs to the grandfather and there's the car that's parked over to the left. I'm looking at this aerial. So is it? Yes. Yes. Parts to the left here. That's the grandfather. Yes. I just want to make sure we're talking about the same thing. So there is there is that I'll keep referring to it as the first gap. And there's a dispute whether there's a four inch gap or a nine inch gap. There's testimony on plaintiff's experts. One says four and the other one says nine. And what I'm trying to say is that let's just say it's nine. Let's just say it's nine. Because the gap between the part grandfather's car and his car. Yes. He's coming through there. Yes. The the gap, even if it's nine inches to a kid. Yes. He he's 19. His slender. And if you take into account the length of the vehicle. Right. The length of his vehicle to get to the back. To then go from both especially mostly says we can't believe he went from fleeing to attacking. I don't know if you remember, but those were his words. And so that's subjective in itself that he's attacking. But nonetheless, the crux of the factual dispute is he's coming towards that first gap. And to be able to navigate that first gap, he has got to slow down. There's no other way to do it because their trucks are I'm sorry, the trucks are so close to each other that he's got to slow down. Can I stop you for a second here? Absolutely. Assume for a moment that he actually had a gun in his hand. We know he didn't. This would be, I think, even under this dispute about where you how he was coming through or how fast it seems to me this would be a case in which qualified immunity would probably be called for. So isn't a critical factual dispute in this case, whether the officers or the shooting officer could have reasonably perceived that what he was carrying was not a gun, but simply a key fob? In other words, if it were undisputed that he had a gun or that he was carrying something, a water pistol that that was undoubtedly looked like a gun, it seems to me you'd have a very hard case. What makes this case more difficult is. The testimony that he was well illuminated. Absolutely. And the and the clear. We all seem to keep up. It's not automatically a gun. Maybe somebody reasonably perceived it to be one or didn't. But that strikes me as the critical question of fact in the case. I would have to agree. And absent that, it seems to me the other factual disputes don't seem to make much of a difference. Because because of the way he was moving. Right. So if the way he's moving, he's not pointing the gun. Right. So I'm going with your some of the testimony is he's got his hands in the air. There is later later. One of the officers says after looking at the expert report, yeah, maybe. Now, I think he was pointing the key fob at me or something. But there seems to be a dispute about where this thing in his hand was positioned. But two and a half years later, remember that Gaudio changed this testimony. Two and a half years later to say that's what it. Well, let me let me ask the question different. Let me ask you to assume that I'd have a difficult time finding the absence of qualified immunity if the if he had a gun in his hand. So the question is, what's the factual issue to be tried about whether the officers reasonably perceive that he had a gun in his hand or not? Several. One, the big one is Mosley. Sergeant Mosley, who is closer to to Alex, did not perceive a threat. Did not see it as a gun. Never called it a gun. Never shouted out. There were several law enforcement, several sheriff. Never shouted that there was a gun. Gaudio never gave a warning. Nobody gave a warning that there was a gun. Well, Gaudio, when he was later interrogated or questioned in the presence of his attorney, said, well, my training would have taught me to give a warning. But there there is a question, in fact, as to whether warnings were given. Correct. There is a there is a question that I would say and proffer to the court that he did not give the warning. He's never said he's won. He never said Mosley never heard it. No, nobody heard this warning. But there were some residents of the area that heard something like get your hands up. Absolutely. And our position, Your Honor, is that once he is down, when he once he is shot, obviously that's what the officers are saying. And that that get your get your hands up. Nobody knows what he's doing. And and that's where those statements come from. Now, the district court, if we were to send this back, the district court could conduct a full trial. And at the close of evidence conclude. That in the totality of the circumstances, these sheriff's deputies acted reasonably, isn't that correct? It is a matter of law. Marcus could hear all of the evidence and say now that I've heard it all. Whether there was a warning given, what direction was he charging at the officers? Were they in reasonable fear? Because, quite frankly, after at the end of the day. The decedent is no choirboy. He had an extensive record of brandishing firearms, right? Depending on how you describe record, because there were allegations. There were no convictions that I'm aware of. A retired law off duty law enforcement officer saw him threaten somebody with a weapon, correct? That that is that's correct. But that in itself is a question. Whether that's accurate is what I mean. The question is that the. To get to your. Sorry to get to your question. Yes. I mean, the district court could the defendant could move or direct a verdict. Judge Marcus could do it on her own motion after she heard all of the evidence. She could. Yes. Live witnesses and exhibits, et cetera. Right. Yes. OK, thank you. I want to ask a question about the record. And you don't seem to rely on this in your briefing. So if you don't think it's relevant, you can tell me. There's some reference to the recording on what I would call a keyhole camera or keyhole device of a neighbor saying something like. He's going to the ground and they shot him. He's on the gun. They shot him. And I can't find that was not transmitted to us. We've asked the district court to to send that that file up to us. What's your contention about that? I don't see anything in your brief about it. It seems to me if there were an eyewitness who said he was going to the ground and they shot him, that would be relevant. But I'm not sure the district court doesn't seem to make a finding about it. It's mentioned in closing. I know the other side says it's indistinct. And the witness eventually says later, I don't remember saying that. But those would seem to be fact issues as opposed to legal issues. I'm just trying to figure out what do you rely on this at all? And if so, why? We do. We read in your brief. Exactly. And the reason is because the the audio at that point to us was was not clear. And that that's the biggest reason. But. After reviewing it and. Reviewing it with our expert didn't make even though I didn't make the brief, we can we can hear that. And the district judge doesn't seem to rely on it. Am I correct? It's not one of the issues she thinks creates an issue of fact. Judge Marcus does not. That is correct. OK. Yeah. And so that that's one issue. The other the other issue is and it goes to reasonableness is. Is. The. The different accounts of by Caudillo, especially that how he perceived what was happening. Waiting two and a half years to change his testimony and saying, I, I perceived him and that's the way he was holding the key fob is very telling. And because. Of his change in statements, especially with the guidance of an attorney. Goes back to, well, credibility, but the reasonableness of how. Alex could have taken the stand that he says now he says was he was holding the fog. I mean, it doesn't make any sense. What how would you why would you want to hold the fog that way? If you're trying to flee or attack, then it would take an incredible amount of time to place that fog the way that that expert is holding it to be able to make it an attempt at looking at that fob and deducing that that it's possibly a gun. And that is what harmony in our expert is saying. That's what Hague what Hague is saying is Alex is falling down again. A contradiction of what Caudillo is saying. That's physical evidence. The trajectory of bullet, the trajectory of the bullet that went. All right. Through through the Ford truck. Also, yes, he is falling down. He is not attacking. Can you help me? And maybe I was confused in this. Where where is the body? The body is found through the gap, correct? Thank you for that question. But I'm trying to figure out where this contested evidence about where he was when he was shot. Very good question, because that body is moved. Your Honor, the body is moved. I'm out of time, but can I finish? The body is moved to render aid to him so that there's two blood puddles. One is very close to the vehicle, which indicates he's going through that first. When you say that vehicle, what vehicle do you mean? Yeah. The first gap between the two vehicles that are between four and nine inches. So he's fallen when he shot. He kind of collapses. And in the blood puddle is right. Really close to the two vehicles that are adjacent to each other that I keep calling the first gap. That indicates he is falling right. He's falling. And he didn't never made it to the wedge or that first gap. That second puddle is what the defense is concentrating on. That's where he's moved. But even that second puddle does not put him next to or even close to the U.N. That's what the experts are saying. Thank you. The factual stuff is what I was looking for. All right. Thank you, counsel. We'll hear rebuttal now. Well, thank you, Your Honor. Thank you. Can you focus specifically on the question whether there is a disputed issue of fact as to how the fob and its attachment were being held and whether that could reasonably be perceived as a firearm? Yeah, we had Steve Iams, who is our police procedures expert, come down and he did his investigation. And I had him take the fob and ask him if he could hold it in a manner that looks like a handgun. And he did that. And we took photos of that. And that's when we showed Officer Cadillo, Deputy Cadillo, those photos. He said, that's what I saw. And he's holding it in a way where you've heard the word index finger. The fob is sitting on top of his index finger. The lanyard is trailing below. Do we know exactly how he is holding it? No. Do we know if the lanyard, which is thick and wide, was piled on top of the fob or how it was being held? We don't know. Here's something that I want to really, really want to clear up. One of the points that he's making is he's contending that Cadillo changed his testimony. And if that's true, that would permit a jury to infer that he's not trustworthy and set aside what he has said. If that's true, then what do you have left that would establish that he was holding in a way that would reasonably be viewed as a firearm? And that's exactly where I was going next. Thank you for raising that because the judge raised that in the order that initially in the order, the first order, the judge said or suggested he didn't really say it was a gun until his deposition was taken two years later, whenever that was, which wasn't true. And we did a motion for reconsideration. You may recall reviewing pointing this out to the judge and the judge said, OK, he did say that in his interview with the detectives after the event, but he only he only talked about there being a gun after there was this hour and a half of questioning and then a break. And then he came back and later in the second half said there was a gun. Your honors, even that is not true. He said it was a gun in that interview. He gave us a record citation. I can. E.R. eight or seven volume. The volume for I have to ask. It's E.R. eight or seven. I don't know the exact volume, but it's all sequential. Here's what he says. And by the way, OK, let me let me finish that up, because that's on page eight or seven. E.R. eight or seven on page eight or nine at the bottom of the page at line thirty one. That's where they take the break. All right. Two pages later, single space. I don't know how much time elapsed. And that break was six minutes. I'm on page eight, four, seven. What line does he say? Go down to thirty one. Thirty one. OK. At that time, I thought he had a gun in his hand. And then he said it again on thirty three. A gun in his hand. And how long into the interview is this? It's well, it's it's just before they felt compelled to take a break. Yes. At eight forty nine at eight forty nine where they take a break at eleven fifty six. That's about an hour and 20 minutes is where they take the break. So it's before that. It's before that. So that, you know, it's not true that he just made this up or he changed his story. Anything. Well, but he did say initially something about him having his hands in the air, did he not? He said his hands are moving, as I recall. This this is very fluid, very dynamic. There's no stop. And keep in mind that their own expert, Dr. Joe Pellis, who's a biomechanical engineer, kind of tried to reenact and reconstruct what happened. And he he he puts the time frame from the time Mr. Lewis exited his truck to that gap that. Left rear corner of the truck of the bed where that gap is at somewhere between two point four and four seconds. That's the time. And by the way, and Kadio says he didn't see him that entire time because he didn't see him exit the truck. If you look at the aerials, you'll see that the way the. Vehicles are parked, Kadio may not have a view of the truck opening. He just sees the guy when he's about at the bed of the truck coming at him. So he doesn't have the full two point four. Excuse me. It was two point seven to four seconds. There are. In order to really understand this whole gap issue, the gap between grandfather's truck or the. Right rear view, outside mirror is and the rear corner of the bed. Let me give you some ER. Can you can you wrap up because I've allowed you to go over your time. Let me give you three for ER numbers. S.E.R. zero zero zero nine one. A.R. one one zero. E.R. three four three. Those are all photographs that you can look at to see what the objects were that he had to get around and get through there. Can I just say one more thing? Yes. And then your time is expired. Yes. I think I lost my place, so I think I'm done. All right. All right. Thank you, counsel. The case just argued will be submitted and the court will stand in recess for the day. Thank you.
judges: HAWKINS, HURWITZ, COLLINS